**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| AIR ALLIANCE HOUSTON,<br>2409 Commerce Street, Houston, TX 77003; | )<br>)<br>) |
| CALIFORNIA COMMUNITIES<br>AGAINST TOXICS,<br>3812 50th Street West, Rosamond, CA 93560; | )<br>)<br>)<br>) |
| COALITION FOR A SAFE ENVIRONMENT,<br>1601 North Wilmington Blvd.<br>Wilmington, CA 90744; | )<br>)<br>)<br>) |
| COMMUNITY IN-POWER AND<br>DEVELOPMENT ASSOCIATION,<br>1301 Kansas Ave., Port Arthur, TX 77640; | )<br>)<br>)<br>) |
| DEL AMO ACTION COMMITTEE,<br>4542 Irone Ave., Rosamond, CA 93560; | )<br>)<br>) |
| ENVIRONMENTAL INTEGRITY PROJECT,<br>1 Thomas Circle, Suite 900,<br>Washington, DC 20005; | )<br>)<br>)<br>) |
| LOUISIANA BUCKET BRIGADE<br>4226 Canal Street, New Orleans, LA 70119; and | )<br>)<br>) |
| TEXAS ENVIRONMENTAL JUSTICE<br>ADVOCACY SERVICES<br>6733 Harrisburg Boulevard, Houston, TX 77011; | )<br>)<br>)<br>) |

Plaintiffs,                                  )

      v.                                      )          Case No. _____

                                         )

LISA P. JACKSON, Administrator,              )          **COMPLAINT FOR**
United States Environmental Protection Agency )          **DECLARATORY AND**
in her official capacity,                     )          **INJUNCTIVE RELIEF**
1101A EPA Headquarters, Ariel Rios Building  )
1200 Pennsylvania Avenue, NW                  )
Washington, D.C. 20460,                       )

Defendant.                                    )
_____)

## INTRODUCTION

Plaintiffs Air Alliance Houston, California Communities Against Toxics, Coalition For a Safe Environment, Community In-Power and Development Association, Del Amo Action Committee, Environmental Integrity Project, Louisiana Bucket Brigade, and Texas Environmental Justice Advocacy Services (collectively, "Plaintiffs") bring this action pursuant to the Clean Air Act, 42 U.S.C. § 7604(a)(2), to compel Defendant Lisa P. Jackson, Administrator of the United States Environmental Protection Agency ("EPA"), to perform nondiscretionary duties required by Section 112(f) of the Clean Air Act, 42 U.S.C. § 7412(f)(2), and Section 112(d)(6) of the Clean Air Act, 42 U.S.C. § 7412(d)(6).  Within eight years of promulgating Section 112(d) standards, Section 112(f) of the Clean Air Act requires the Administrator to either promulgate additional standards under Section 112(f)(2) due to the current risk to public health or the environment after the application of the Section 112(d) standards, or to determine that residual risk standards are not required to protect human health or the environment. *Id.* § 7412(f). In addition, the Clean Air Act requires the Administrator to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies)" the emission standards for hazardous air pollutants promulgated under Section 112(d) at least every eight years after such standards are initially promulgated. *Id.* § 7412(d)(6).  Yet the Administrator has not fulfilled these responsibilities as required by Sections 112(f)(2)  and 112(d)(6) for the following major source categories of hazardous air pollutants:

(1) Petroleum Refineries: Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units, 67 Fed. Reg. 17,762 (Apr. 11, 2002) (40 C.F.R. Part 63, Subpart UUU) ("Subpart UUU");

(2) Petroleum Refineries, 60 Fed. Reg. 43,244 (Aug. 18, 1995) (40 C.F.R. Part 63,

Subpart CC) ("Subpart CC").

Consequently, for each of the source categories enumerated above, Plaintiffs seek both a

determination that the Administrator's failures to fulfill each overdue duty and perform each

action required by Sections 112(d)(6) and 112(f)(2) violate the Clean Air Act and an order to

compel the Administrator to fulfill each such duty and take each such action in accordance with

an expeditious deadline set by this Court.

## JURISDICTION AND VENUE

1.      This action arises under Sections 112(f) and 112(d)(6) of the Clean Air Act

("CAA" or "the Act"), 42 U.S.C. §§ 7412(f)(2), 7412(d)(6).  This Court has jurisdiction over this

action pursuant to Section 304(a)(2) of the CAA, 42 U.S.C. § 7604(a)(2), 28 U.S.C. §§ 1331 and

1361. This Court may order the Administrator to perform the requisite acts and duties, may issue

a declaratory judgment and may grant further relief pursuant to Section 304(a), 42 U.S.C. §

7604(a), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  Plaintiffs have the right to

bring this action pursuant to Section 304(a)(2) of the CAA, 42 U.S.C. § 7604(a)(2), and the

Administrative Procedure Act, 5 U.S.C. §§ 701-06.

2.      By certified letter to the Administrator posted on July 18, 2012, Plaintiffs gave

notice of this action as required by Section 304(b)(2) of the CAA, 42 U.S.C. § 7604(b)(2), and

40 C.F.R. Part 54.

3.      Venue is vested in this Court under 28 U.S.C. § 1391(e) because Defendant EPA

Administrator Lisa P. Jackson resides in this district.

**PARTIES**

4.      Plaintiff Air Alliance Houston is a nonprofit corporation organized and existing under the laws of the State of Texas, located in Houston, Texas.  Air Alliance Houston works to reduce toxic air pollution on behalf the communities it serves in the Houston region to protect public health and environmental integrity through research, education and advocacy, and is particularly concerned about the need to reduce toxic air pollution from the nine refineries in the Houston area (BP's Texas City Refinery (FRS 110033466005), ConocoPhillips' Sweeny Refinery (FRS 110007182360), ExxonMobil's Baytown Refinery (FRS 110000502901), Houston Refining's Houston Refinery (FRS 110015737210), Marathon Petroleum's Texas City Refinery (FRS 110000463793), Pasadena Refining System's Pasadena Refinery (FRS 110000462703), Deer Park Refining Limited Partnership's Deer Park Refinery, (FRS 110041458829), Valero's Texas City Plant (FRS 110001867301), and Valero's Houston Refinery (FRS 11000460885)).

5.      Plaintiff California Communities Against Toxics is a community nonprofit organization located in Rosamond, California. California Communities Against Toxics brings this action on behalf of itself and its adversely affected members. California Communities Against Toxics advocates for environmental justice and protection from toxic air pollution in the State of California and nationally.  It is especially concerned about strengthening protection for its members living near the 21 refineries located in the State of California.

6.      Plaintiff Coalition for a Safe Environment (CFASE) is a nonprofit community-based organization existing under the laws of the State of California, located in Wilmington, California. CFASE brings this action on behalf of itself and its adversely affected members, particularly those that live near the four petroleum refineries in Wilmington (Ultramar's Valero

Wilmington Refinery, ConocoPhillips' Wilmington Plant, Tesoro's Wilmington-LA Refinery, and Valero's Wilmington Asphalt Plant). CFASE is dedicated to improving environmental health, public safety, and justice in southern California.

7.      Plaintiff Community In-Power and Development Association is a nonprofit corporation organized and existing under the laws of the State of Texas, located in Port Arthur, Texas. Community In-Power and Development Association brings this action on behalf of itself and its adversely affected members who are affected by the toxic air pollution coming from three petroleum refineries in the Port Arthur area in Southeast Texas (Valero's Port Arthur Refinery, formerly known as the Premcor Port Arthur Refinery, Total Petrochemicals' Port Arthur Refinery, and Motiva's Port Arthur Refinery). Community In-Power and Development Association advocates for its members' environmental justice, social rights, and economic rights.

8.      Plaintiff Del Amo Action Committee is a nonprofit community organization based in the Los Angeles Harbor Gateway area in southern California. Del Amo Action Committee brings this action on behalf of itself and its members who are adversely affected by toxic air pollution coming from ExxonMobil's Torrance, CA Refinery.  Del Amo Action Committee strives to enhance the health and safety of its members and their local community by advocating for policy changes that promote environmental justice.

9.      Plaintiff Environmental Integrity Project is a nonprofit organization located in Washington, D.C.  Environmental Integrity Project advocates for more effective enforcement of environmental laws by providing analysis on how the failure to enforce environmental laws increases pollution, holding federal and state agencies accountable for failing to enforce or comply with environmental laws, and helping local communities obtain protection of environmental laws.

5

10.     Plaintiff Louisiana Bucket Brigade is a nonprofit environmental health and justice organization located in New Orleans, Louisiana. Louisiana Bucket Brigade brings this action on behalf of itself and its adversely affected members, including those members living near and affected by the seventeen petroleum refineries in Louisiana. Its mission is to work with communities to create Louisiana neighborhoods free from refineries' toxic air pollution and other types of industrial pollution.

11.     Plaintiff Texas Environmental Justice Advocacy Services (TEJAS) is a nonprofit corporation located in Houston, Texas.  TEJAS brings this action on behalf of itself and the community members it serves who live near the eight petroleum refineries in the Houston Ship Channel (including BP's Texas City Refinery (FRS 110033466005), ExxonMobil's Baytown Refinery (FRS 110000502901), Houston Refining's Houston Refinery (FRS 110015737210), Marathon Petroleum's Texas City Refinery (FRS 110000463793), Pasadena Refining System's Pasadena Refinery (FRS 110000462703), Deer Park Refining Limited Partnership's Deer Park Refinery, (FRS 110041458829), Valero's Texas City Plant (FRS 110001867301), and Valero's Houston Refinery (FRS 11000460885)).  TEJAS's mission is to create sustainable, healthy communities in the Houston Ship Channel region by educating individuals on health concerns from environmental pollution and empowering individuals to promote enforcement of environmental laws.

12.     Defendant Lisa P. Jackson is the Administrator of the Environmental Protection Agency, and in that role is charged with the duty to uphold the Clean Air Act and to take required regulatory actions according to the schedules established therein.

## LEGAL FRAMEWORK

13.     The Clean Air Act has the purpose "to protect and enhance the quality of the

Nation's air resources so as to promote the public health and welfare and the productive capacity

of its population."  42 U.S.C. § 7401(b)(1).

14.     Congress enacted the Clean Air Act because "the growth in the amount and

complexity of air pollution brought about by urbanization, industrial development, and the

increasing use of motor vehicles, has resulted in mounting dangers to the public health and

welfare, including injury to agricultural crops and livestock, damage to and the deterioration of

property, and hazards to air and ground transportation." *Id.* § 7401(a)(2).

15.     A "primary goal" of the Clean Air Act is "pollution prevention." *Id.* § 7401(c).

16.     To accomplish these objectives, the CAA prescribes a regulatory framework that

mandates EPA to set standards that limit hazardous air pollutants by specific deadlines to reduce

emissions of hazardous air pollutants ("HAP") and resulting harm to health and the environment.

17.     In the 1990 Clean Air Act Amendments, Congress established new requirements

for EPA to control toxic air pollution under Section 112 of the Clean Air Act.  *Id.* § 7412.   By

statute, Congress listed 189 hazardous air pollutants ("HAPs") for regulation.  *Id.* § 7412(b)(1);

*see also id.* § 7412(a)(6) (defining "hazardous air pollutant" by reference to § 7412(b)).

18.     The statute requires EPA to list categories of major sources of these air pollutants.

*Id.* § 7412(c)(1).

19.     EPA then must promulgate emission standards for each listed category or

subcategory of major sources of hazardous air pollutants, pursuant to Section 112(d)(2)-(3). *Id.* §

7412(d)(1)-(3).  A "major source" is defined as "any stationary source or group of stationary

sources located within a contiguous area and under common control that emits or has the

7

potential to emit considering controls, in the aggregate, 10 tons per year or more of any

hazardous air pollutant or 25 tons per year or more of any combination of hazardous air

pollutants." *Id.* § 7412(a)(1).  Section 112(d)(2)-(3) standards are known as "maximum

achievable control technology" or "MACT" standards.

20.     Once the Administrator has promulgated emission standards pursuant to Section

112(d) for a source category, then Section 112(d)(6) provides that "[t]he Administrator shall

review, and revise as necessary (taking into account developments in practices, processes, and

control technologies), emission standards promulgated under this section no less often than every

8 years." *Id.* § 7412(d)(6).

21.     This provision requires the Administrator either to revise the existing Section

112(d) standards or to promulgate a final determination not to revise them based upon a

published finding that revision is not "necessary" to ensure the emission standards satisfy

Section 112(d) of the Act.  *Id.*

22.     The provision "to protect health and environment," Section 112(f), *id.* § 7412(f),

directs EPA, first, to investigate and report to Congress on

> (A) methods of calculating the risk to public health remaining, or
> likely to remain, from sources subject to regulation under this
> section [*i.e.*, 42 U.S.C. § 7412] after the application of standards
> under subsection (d) of this section;
>
> (B) the public health significance of such estimated remaining risk
> and the technologically and commercially available methods and
> costs of reducing such risks;
>
> (C) the actual health effects with respect to persons living in the
> vicinity of sources, any available epidemiological or other health
> studies, risks presented by background concentrations of hazardous
> air pollutants, any uncertainties in risk assessment methodology or
> other health assessment technique, and any negative health or

8

environmental consequences to the community of efforts to reduce
such risks; and

(D) recommendations as to legislation regarding such remaining risk.

*Id.* § 7412(f)(1).

23.     EPA released a report to Congress in 1999.  EPA, Residual Risk Report to

Congress, EPA-453/R-99-001 (Mar. 1999) ("Residual Risk Report").

24.     Congress did not act on any recommendation in that report.

25.     "If Congress does not act on any recommendation submitted under paragraph

(1)," then, Section 112(f)(2) of the Act requires the Administrator to promulgate health-based

standards for all sources for which EPA had promulgated Section 112(d) standards "within 8

years." 42 U.S.C. § 7412(f)(2). Section 112(f)(2) directs that:

> [T]he Administrator shall, within 8 years after promulgation of
> standards for each category or subcategory of sources pursuant to
> [§ 112(d)], promulgate standards for such category or subcategory
> if promulgation of such standards is required in order to provide an
> ample margin of safety to protect public health in accordance with
> this section (as in effect before November 15, 1990) or to prevent,
> taking into consideration costs, energy, safety, and other relevant
> factors, an adverse environmental effect . . . . If standards
> promulgated pursuant to subsection (d) of this section and
> applicable to a category or subcategory of sources emitting a
> pollutant (or pollutants) classified as a known, probable or possible
> human carcinogen do not reduce lifetime excess cancer risks to the
> individual most exposed to emissions from a source in the category
> or subcategory to less than one in one million, the Administrator
> shall promulgate standards under this subsection for such source
> category.
> . . .
>
> (C) The Administrator shall determine whether or not to
> promulgate such standards and, if the Administrator decides to
> promulgate such standards, shall promulgate the standards 8 years
> after promulgation of the standards under [§ 112(d)] for each
> source category or subcategory concerned . . . .

9

*Id.*

26.     EPA has generally described Section 112(f)(2) standards as "residual risk" standards that must address "the health and environmental risks remaining after technology-based standards have been promulgated (i.e., the residual risks)."  Residual Risk Report at 1.

27.     In sum, if residual risk standards are "required in order to provide an ample margin of safety to protect public health" or "to prevent . . . an adverse environmental effect," then the Administrator must promulgate these standards within eight years of the Section 112(d) standards.  42 U.S.C. § 7412(f)(2).

28.     The Act applies Section 307(d) rulemaking requirements to "the promulgation or revision of any . . . emission standard or limitation under section 7412(d) of this title" and "any standard under section 7412(f) of this title," among others.  *Id.* § 7607(d)(1)(C).

29.     Thus, to fulfill its Section 112(f)(2) and Section 112(d)(6) duties, EPA must provide public notice, consider public comments received, perform all other requirements described in CAA Section 307(d), *id.* § 7607(d), and promulgate a final rule or determination.

30.     Section 112(d) and 112(f) standards become effective "upon promulgation."  *See id.* §§ 7412(d)(1), (f)(3); *see also id.* § 7412(f)(4) (setting compliance dates for Section 112(f) standards); *id.* § 7412(i) (setting compliance schedule for Section 112(d) standards).

## FACTUAL BACKGROUND

31.     In 1992, EPA listed petroleum refineries as two categories of major sources of hazardous air pollutants under Section 112(c)(1), 42 U.S.C. § 7412(c)(1), of the Clean Air Act: Petroleum Refineries—Catalytic Cracking (Fluid and other) Units, Catalytic Reforming Units, and Sulfur Plant Units; and Petroleum Refineries—Other Sources Not Distinctly Listed.  EPA,

Notice of Initial List of Categories of Major and Area Sources, 57 Fed. Reg. 31,576, 31,591 tbl.

1 (July 16, 1992).

32.    As defined in EPA's regulations, a "petroleum refinery" is:

an establishment engaged primarily in petroleum refining as
defined in the Standard Industrial Classification (SIC) code 2911
and the North American Industry Classification (NAIC) code
32411, and used mainly for: (i) Producing transportation fuels
(such as gasoline, diesel fuels, and jet fuels), heating fuels (such as
kerosene, fuel gas distillate, and fuel oils), or lubricants; (ii)
Separating petroleum; or (iii) Separating, cracking, reacting, or
reforming an intermediate petroleum stream, or recovering a by-
product(s) from the intermediate petroleum stream (e.g., sulfur
recovery).

40 C.F.R. § 63.1561(a)(1) (definition of "petroleum refinery"); *id.* § 63.641 (same, providing

examples).

33.    Generally, petroleum refining involves the separation of crude oil into its major

components (or distillation fractions), using physical, thermal, and chemical processes.

Additional steps are then used to create finished petroleum products, such as fuels (e.g., motor

gasoline, diesel, kerosene, jet fuel), nonfuel products such as solvents, lubricating oils, greases,

petroleum jelly, asphalt, and coke, and chemical industry feedstocks (such as naphtha, ethane,

propane, butane, butadiene, benzene, toluene, and xylene).  EPA, Office of Compliance, Profile

of the Petroleum Refining Industry, EPA/310-R-95-013 (Sept. 1995) ("Sector Notebook"),

www.epa.gov/compliance/resources/publications/assistance/sectors/notebooks/petrefsn.pdf (last

viewed Sept. 12, 2012).

34.    A catalytic cracking unit "uses heat, pressure and a catalyst to break larger

hydrocarbon molecules into smaller, lighter molecules," and designs include fixed-bed reactors,

moving-bed reactors, fluidized-bed reactors, and once-through units.  Sector Notebook at 22-24.

11

A catalytic reforming unit "uses catalytic reactions to process primarily low octane . . . gasolines and naphthas into high octane aromatics." *Id.* at 29. A sulfur recovery unit removes sulfur from off-gas streams in order to recover elemental sulfur, which can be sold, and to reduce sulfur oxide emissions. *Id.* at 35; *see also* 40 C.F.R. § 63.1579 (definitions of catalytic cracking unit, catalytic reforming units, sulfur plant units).

35.     The petroleum manufacturing industry is one of the ten largest industrial sources of total pollution releases in the United States. The Right-to-Know Network, TRI quantities by industry for 2010, http://www.rtknet.org/db/tri/industry (viewed Sept. 21, 2012); EPA, Toxic Release Inventory, http://www.epa.gov/tri/tridata/data/basic/index.html (viewed Sept. 19, 2012).

36.     On August 18, 1995, EPA promulgated national emission standards for hazardous air pollutants ("NESHAP") for petroleum refineries under Section 112(d). National Emission Standards for Hazardous Air Pollutants: Petroleum Refineries; Final Rule, 60 Fed. Reg. 43,244 (Aug. 18, 1995) (codified at 40 C.F.R. Part 63, Subpart CC); Subpart CC Proposed Rule, 59 Fed. Reg. 36,130 (July 15, 1994). EPA took this action to meet a court-ordered deadline. Subpart CC Final Rule, 60 Fed. Reg. at 43,244.

37.     On April 11, 2002, EPA promulgated NESHAP under Section 112(d) for the following additional emission points or sources at petroleum refineries: catalytic cracking units, catalytic reforming units, and sulfur recovery units. Petroleum Refineries: Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units, Final Rule, 67 Fed. Reg. 17,762, 17,762 (April 11, 2002) (codified at 40 C.F.R. pt. 63, Subpart UUU); 40 C.F.R. § 63.1562 (explaining coverage of Subpart UUU); *see also* Subpart UUU Proposed Rule, 63 Fed. Reg. 48,890 (Sept. 11, 1998). Subpart UUU covers the process vents from these units; other emissions associated with these units are covered under Subpart CC.

## SPECIFIC ALLEGATIONS

**Petroleum Refineries Subpart UUU**

38.     The Administrator was required to take final action to fulfill its Section 112(f)(2), 42 U.S.C. § 7412(f)(2), and Section 112(d)(6), *id.* § 7412(d)(6), duties for petroleum refineries subject to 40 C.F.R. Part 63 Subpart UUU by April 11, 2010, *i.e.*, "within 8 years after promulgation" of Subpart UUU and "no less often than every 8 years."

39.     The Administrator has not completed a review of the risk to public health and the environment for petroleum refineries subject to Subpart UUU.

40.     The Administrator has not promulgated a final rule or determination pursuant to Section 112(f)(2) for petroleum refineries subject to Subpart UUU.

41.     No rule or determination for petroleum refineries subject to Subpart UUU promulgated pursuant to Section 112(f)(2) is currently effective.

42.     The Administrator has not completed a review of Subpart UUU for petroleum refineries pursuant to Section 112(d)(6).

43.     The Administrator has not promulgated a revised final rule or determination pursuant to Section 112(d)(6) for petroleum refineries subject to Subpart UUU.

44.     No rule or determination promulgated pursuant to Section 112(d)(6) for petroleum refineries subject to Subpart UUU is currently effective.

45.     The Administrator has an ongoing, unmet, nondiscretionary duty to complete a review of the current risk to public health and the environment and promulgate either a Section 112(f)(2) final rule or determination for petroleum refineries subject to Subpart UUU.

46.     The Administrator has an ongoing, unmet, nondiscretionary duty to complete a review of Subpart UUU and promulgate either a revised Section 112(d) final rule or Section 112(d)(6) determination for petroleum refineries subject to Subpart UUU.

47.     Each day the Administrator fails to take these legally required actions, EPA commits new, additional, and ongoing violations of its duties under Sections 112(f)(2) and (d)(6) of the Clean Air Act, 42 U.S.C. §§ 7412(f)(2), (d)(6).

48.     The Administrator has thereby failed to perform nondiscretionary acts and duties within the meaning of Section 304(a)(2), 42 U.S.C. § 7604(a)(2), for petroleum refineries subject to Subpart UUU.

**Petroleum Refineries Subpart CC**

49.     The Administrator was required to take final action to fulfill its Section 112(f)(2), 42 U.S.C. § 7412(f)(2), and Section 112(d)(6), *id.* § 7412(d)(6), duties for petroleum refineries subject to 40 C.F.R. Part 63 Subpart CC by August 18, 2003, *i.e.*, "within 8 years after promulgation" of Subpart CC and "no less often than every 8 years."

50.     The Administrator has not completed a review of the risk to public health and the environment for petroleum refineries subject to Subpart CC.

51.     The Administrator has not promulgated a final determination or rule pursuant to Section 112(f)(2) for petroleum refineries subject to Subpart CC.

52.     No rule or determination promulgated under Section 112(f)(2) for petroleum refineries subject to Subpart CC is currently effective.

53.     The Administrator has not completed a review of Subpart CC pursuant to Section 112(d)(6).

54.     The Administrator has not promulgated a final determination or rule pursuant to Section 112(d)(6) for petroleum refineries subject to Subpart CC.

55.     No rule or determination promulgated pursuant to Section 112(d)(6) for petroleum refineries subject to Subpart CC is currently effective.

56.     On January 16, 2009, former EPA Administrator Stephen Johnson signed a Section 112(d)(6) and Section 112(f)(2) rulemaking document regarding Subpart CC.  EPA, Proposed Partial Withdrawal of Final Rule, 74 Fed. Reg. 55,505, 55,506 (Oct. 28, 2009).

57.     That rulemaking document was never published in the Federal Register.

58.     On October 28, 2009, EPA proposed to withdraw and on July 18, 2011, EPA completed the withdrawal of that document.  National Emission Standards for Hazardous Air Pollutants From Petroleum Refineries, Final Rule and Partial Withdrawal, 76 Fed. Reg. 42,052, 42,052 (July 18, 2011).  In doing so, EPA stated: "EPA has determined that the residual risk and technology reviews may not accurately characterize the risk posed by this source category," and that it was necessary to "gather better emissions information from the refining industry" before finalizing action under Sections 112(f)(2) and (d)(6).  *Id.* at 42,053.

59.     No final rule or final determination for petroleum refineries Subpart CC was ever published in the Federal Register or promulgated under Sections 112(f)(2) or (d)(6) of the Act.

60.     No final rule or final determination promulgated under Sections 112(f)(2) or 112(d)(6) for petroleum refineries Subpart CC ever took effect.

61.     Thus, EPA remains in continuing violation of its nondiscretionary duty under Clean Air Act §§ 112(f)(2) and 112(d)(6) to complete the required reviews and promulgate revised standards or the required determinations for petroleum refineries subject to Subpart CC.

62.     In addition, EPA was again required to fulfill its 8-year review and revision duty pursuant to Section 112(d)(6) for Subpart CC by August 18, 2011, *i.e.*, "no less often than every 8 years."

63.     EPA still has failed to complete a review or promulgate a final rule or determination regarding a revision of the Section 112(d) standards in Subpart CC pursuant to Section 112(d)(6).

64.     More than two 8-year cycles (over 16 years) have now passed without EPA promulgating revised Section 112(d) standards or a final Section 112(d)(6) determination for Petroleum Refineries Subpart CC.

65.     The Administrator has an ongoing, unmet, nondiscretionary duty to complete a review of current risk to public health and the environment and promulgate either a Section 112(f)(2) final rule or determination for petroleum refineries subject to Subpart CC.

66.     The Administrator has an ongoing, unmet, nondiscretionary duty to complete a review of Subpart CC and promulgate either a revised Section 112(d) final rule or Section 112(d)(6) determination for petroleum refineries subject to Subpart CC.

67.     Each day the Administrator fails to take these legally required actions, EPA commits a new, additional, and ongoing violation of its duties under Sections 112(f)(2) and (d)(6) of the Clean Air Act.

68.     The Administrator has thereby failed to perform nondiscretionary acts and duties within the meaning of Section 304(a)(2), 42 U.S.C. § 7604(a)(2), for petroleum refineries subject to Subpart CC.

**ALLEGATIONS OF INJURY**

69.     Hazardous air pollutants emitted by petroleum refineries include organics (*e.g.*, acetaldehyde, benzene, 1,3-butadiene, dioxins, furans, formaldehyde, hexane, phenol, polycyclic organic matter, toluene, and xylene); reduced sulfur compounds (*e.g.*, carbonyl sulfide, carbon disulfide); inorganics (*e.g.*, hydrogen chloride, chlorine, hydrogen cyanide); particulate metals (*e.g.*, antimony, arsenic, beryllium, cadmium, chromium, cobalt, lead, manganese, and nickel), and mercury. Subpart CC Final Rule, 60 Fed. Reg. at 43,245; Subpart UUU Proposed Rule, 63 Fed. Reg. at 48,892; *see also* Subpart UUU Final Rule, 67 Fed. Reg. at 17,762.

70.     Emission factors for petroleum refineries are inaccurate and emission reporting, such as to the National Emissions Inventory, based on such factors has long underestimated air emissions from petroleum refineries.  *See, e.g.*, Ofc. of Inspector Gen., U.S. EPA, EPA Can Improve Emissions Factors Development and Management at 11-12 (No. 2006-P-00017) (Mar. 22, 2006) (explaining that for refineries "[t]he under-reporting was caused largely due to the use of poor quality emissions factors"); Memorandum from Brenda Shine, U.S. EPA, Potential Low Bias of Reported VOC Emissions from the Petroleum Refining Industry, Doc. ID No. EPA-HQ-OAR-2003-0146-0010 (July 27, 2007) ("This document provides the basis for our hypothesis that there is a systematic low bias in reported emissions of VOC and air toxics from petroleum refineries.").

71.     EPA recently collected emission data from petroleum refineries pursuant to CAA Section 114, 42 U.S.C. § 7414.

72.     These data show that approximately 150 existing refineries in 32 states emit a total of over 20,000 tons per year of hazardous air pollutants, including 1,346 tons of benzene, 4,079 tons of hydrogen cyanide, 443 tons of formaldehyde, 282 tons of naphthalene, and 218

tons of hydrogen fluoride.  Some additional pollutants emitted in the highest amounts include

toluene, hexane, styrene, xylenes, and methanol. Testing at cooling towers, performed pursuant

to EPA's recent information collection request, showed that these units emit tons of unreported

benzene, ethylbenzene, and xylene.  Testing at fluid catalytic cracking units (FCCUs) revealed

hundreds of tons of previously unreported hydrogen cyanide emissions.  EPA, Comprehensive

Data Collected from the Petroleum Refining Sector,

http://www.epa.gov/ttn/atw/petref/petrefpg.html (last updated Sept. 14, 2012).

73.     In finalizing the original NESHAP rule for Petroleum Refineries Subpart CC,

EPA stated that hazardous air pollutant emissions from petroleum refineries are associated with

harm to human health and the environment.  Subpart CC Final Rule, 60 Fed. Reg. at 43,245.  For

example, EPA found:

> The HAP's controlled by this rule are associated with a variety of
> adverse health effects. The range of adverse health effects include
> cancer and a number of other chronic health disorders (e.g.,
> aplastic anemia, pancytopenia, pernicious anemia, pulmonary
> (lung) structural changes) and a number of acute health disorders
> (e.g., dyspnea (difficulty in breathing), upper respiratory tract
> irritation with cough, conjunctivitis, neurotoxic effects (e.g., visual
> blurring, tremors, delirium, unconsciousness, coma, convulsions).

*Id.*  EPA further recognized that the HAPs emitted by refineries, such as benzene, are classified

as human carcinogens. *Id.*  Long-term exposure to benzene can cause an increased risk of cancer

in humans (such as leukemia, lymphoma, myeloma) as well as aplastic anemia, pancytopenia,

chromosomal breakages, and weakened bone marrow. *Id.*  As EPA further stated: "Exposure to

n-hexane can cause polyneuropathy (muscle weakness and numbness) in humans." *Id.* at 43,245.

Further, "exposure to naphthalene is linked to cataracts and anemia in human infants." *Id.* EPA

also found that exposure to some emitted pollutants (*e.g.*, phenol) "is very toxic to animals," and

that "[e]missions of VOC [volatile organic compounds] have been associated with a variety of health and welfare impacts." *Id.*

74.    In issuing Subpart UUU, EPA further found that the toxic air emissions from catalytic cracking units, catalytic reforming units, and sulfur plant units at petroleum refineries cause harm to human health and the environment. Subpart UUU Proposed Rule, 63 Fed. Reg. at 48,890.  For example, metals emitted by petroleum refineries can cause effects such as mucous membrane irritation (e.g., bronchitis, decreased lung capacity), gastrointestinal effects, nervous system disorders (from loss of function to tremor and numbness), skin irritation, and reproductive and developmental disorders. *Id.* at 48,892.  Metals accumulate in the human body and the environment and many are known or probable human carcinogens. *Id.*  Carbonyl sulfide "may cause narcotic central nervous system effects and skin and eye irritation." *Id.*  Acute inhalation exposure to hydrogen chloride may cause "coughing, hoarseness, inflammation and ulceration of the respiratory tract, chest pain, and pulmonary edema in humans." *Id.* Further, volatile organic compounds emitted by petroleum refineries (e.g., formaldehyde) are precursors to the formation of ozone in the ambient air, and ozone causes numerous human health and environmental problems. For example:

> At elevated levels, ozone has been shown in human laboratory and/or community studies to be responsible for the reduction of lung function, respiratory symptoms (e.g., cough, chest pain, throat and nose irritation), increased hospital admissions for respiratory causes, and increased lung inflammation. Animal studies have shown increased susceptibility to respiratory infection and lung structure changes. Ambient ozone also has been linked to adverse effects on agricultural crops and forests.

*Id.* at 48,893.

75.     In recent years, the National Academy of Sciences and other scientific experts have released significant amounts of new information on the ways in which toxic chemicals emitted by petroleum refineries affect exposed people, particularly children, and on ways governmental agencies such as EPA can account for the real-world risk faced by communities exposed to toxic air pollution.

76.     Yet EPA has not considered or accounted for this new information in regard to communities exposed to toxic air pollution from petroleum refineries as it will be required to do as part of the required health impact assessment under Section 112(f)(2) and the rulemaking to determine whether to set stronger standards to protect public health pursuant to this provision.

77.     There is significant information available demonstrating that refineries can control their pollution at a greater rate than many facilities currently do.  For example, EPA has required some refineries to achieve greater emission reductions than existing standards require as part of its Petroleum Refinery National Initiative, which has led to negotiated settlements with refineries to require compliance with existing standards.  *See* http://www.epa.gov/compliance/resources/cases/civil/caa/oil (last viewed Sept. 26, 2012); *see, e.g.*, Marathon Petroleum Company, LP and Catlettsburg Refining, LLC Settlement Information Sheet ("Marathon has agreed to state-of-the-art controls on combustion devices known as flares and to a cap on the volume of waste gas it will send to its flares. When fully implemented, the agreement is expected to reduce harmful air pollution . . . and result in future cost savings for the company."), http://www.epa.gov/compliance/resources/cases/civil/caa/marathonrefining.html (last viewed Sept. 14, 2012).  EPA's settlement with Marathon Petroleum Company requires this company to use flare gas recovery units to capture and recycle waste gas at its refinery, and to upgrade the flare instrumentation to assure optimal flare efficiency. This type of measure has

been found to reduce the emission of hazardous air pollutants by 110 tons (220,000 pounds), per year initially, with additional, significant emission reductions expected in future years.  U.S. Dep't of Justice, Press Release, U.S. Announces Innovative Clean Air Agreement for Industrial Flares with Marathon Petroleum Company (April 5, 2012), available at http://www.justice.gov/opa/pr/2012/April/12-enrd-431.html ("From 2008 to the end of 2011, the controls Marathon installed eliminated approximately . . . 110 tons per year of hazardous air pollutants (HAPs) from the air. An additional . . . 30 tons per year of HAPs are projected to be eliminated in the future.").

78.     In April 2012, EPA released a new study that showed that the use of flares to control emissions from sources like refineries has likely produced much lower amounts of reductions than the 98% control efficiency level assumed under the existing rules. U.S. EPA Ofc. of Air Quality Planning & Standards, Parameters for Properly Designed and Operated Flares, Report for Flare Review Panel (Apr. 2012), http://www.epa.gov/ttn/atw/flare/2012flaretechreport.pdf.

79.     This study shows that EPA must update its approach regarding flares, that it can ensure much more effective control of toxic air emissions from flares to protect exposed communities, and thus presents an example of a significant issue that EPA must address as part of the overdue rulemakings under CAA section 112(f)(2) and (d)(6).

80.     However, EPA has not updated the national emission standards for refineries to require emission reductions and to account for new information on flares and control technologies and other requirements of recent consent decrees, even though these are significant "developments" under Section 112(d)(6) which show that greater emission reductions are being

achieved and are "achievable" under Section 112(d)(3), and could be used to provide the

requisite "ample margin of safety to protect public health" under Section 112(f)(2).

81.     Plaintiffs and their members have been and will continue to be harmed by the

Administrator's failures to act and fulfill the duties required by Sections 112(f)(2) and 112(d)(6),

42 U.S.C. §§ 7412(f)(2), 7412(d)(6), for Petroleum Refineries Subparts CC and UUU.

82.     Plaintiffs have members who reside, work, recreate, and breathe air near

petroleum refineries, including those described above in California, Louisiana, and Texas.  In the

course of their activities and exposures, Plaintiffs' members have experienced and continue to

experience or are likely to experience harm to their health, environmental, recreational, aesthetic,

and economic interests due to the Administrator's ongoing failures to take the actions required

by Sections 112(f)(2) and 112(d)(6) to reduce toxic air emissions from petroleum refineries.

Plaintiffs' members also have a reasonable concern about suffering harm to their health,

aesthetic, recreational, and other interests due to exposure to the hazardous air pollutants emitted

by petroleum refineries.  Plaintiffs' members enjoy natural resources that are or are likely to be

adversely affected by petroleum refinery pollution.  Plaintiffs' members have regularly faced and

currently live subject to the likelihood of continuing to experience emission spikes, equipment

malfunctions, power failures, and explosions from refineries that undermine their ability to live

their lives and follow day-to-day routines and threaten their ability to enjoy being inside their

homes, as well as their ability to walk, bike, garden, play, or sit outside near their homes.

83.     The Administrator's failures to take actions required by Sections 112(d)(6) and

112(f)(2) for petroleum refineries, as enumerated above, cause Plaintiffs and their members to

suffer the injuries alleged.  Due to the Administrator's failures to promulgate revised emission

standards as required by Section 112(d)(6) and the failures to review and assess affected

community health impacts and promulgate residual risk standards pursuant to Section 112(f)(2)

for petroleum refineries, Plaintiffs and their members and the land, waters, wildlife, and plants in

their local communities are exposed to hazardous air pollutants and suffer the harms described

above due to this exposure.  By not revising the existing standards pursuant to Section 112(d)(6)

and by not promulgating residual risk standards under Section 112(f)(2) to provide an ample

margin of safety or prevent an adverse environmental effect, the Administrator deprives

Plaintiffs and their members of the emission reductions that would result.  Consequently,

defendant EPA prolongs and increases Plaintiffs' members' exposure to hazardous air pollutants

and related adverse health, recreational, and aesthetic injuries as described above.  Defendant

EPA also prolongs and increases the HAP exposure of wildlife, plant, water, and land resources

in Plaintiffs' members' local communities to hazardous air pollutants, resulting in the harm to

their legally protected aesthetic, health, welfare, recreational, and other interests as described

above.  Emission reductions taken under Sections 112(d)(6) and 112(f)(2) would reduce this

exposure to hazardous air pollutants, and would reduce the related health, environmental,

recreational, aesthetic, and other harm suffered by Plaintiffs and their members.

      84.    Plaintiffs' missions include public education, advocacy, public health research,

community air quality monitoring, and litigation to enforce and strengthen environmental laws

and to prevent, reduce, and mitigate toxic air pollution and its adverse effects, including from

petroleum refineries.  As part of and to achieve their mission, Plaintiffs analyze and provide their

members and the public, in person and through media (such as photographs, video

documentaries, posters, Power Point presentations, fact sheets, and newsletters) with information

regarding the adverse impacts of toxic air pollution and potential for stricter pollution control

available for petroleum refineries.  It is a core part of Plaintiffs' mission to provide this type of

information and educational service to their members to assist their members in advocating for greater protection for their health, aesthetic, recreational, and other legally protected interests.

24.      By not reviewing the existing emission standards or issuing the statutorily required final determinations regarding the emission standards pursuant to Section 112(d)(6) or regarding residual risk standards under Section 112(f)(2), the Administrator deprives Plaintiffs and their members of information, published findings, and determinations regarding topics such as technology available to prevent, control, and minimize releases of hazardous air pollutants, the current risk of cancer and other toxic health and environmental effects, and other information from the required community health impact assessment due to exposure to HAP emissions from petroleum refineries.  These types of information would be provided to Plaintiffs, their members, and the public as part of the Administrator's required actions pursuant to Sections 112(d)(6) and 112(f)(2).  *See, e.g.*, 42 U.S.C. § 7607(d)(3)-(6) (describing notice and informational disclosures required for rulemakings under Sections 7412(d) and (f)).  These failures make it more difficult for Plaintiffs and their members to advocate for good health, safety, and environmental protection from hazardous air pollutants, to shield themselves, their families, employees, and communities from exposure to such pollutants, and to protect their health, recreational, aesthetic, and other interests.  This lack of information due to the lack of a complete EPA rulemaking under CAA § 307(d), 42 U.S.C. § 7607(d), hampers the ability of Plaintiffs and their members to take actions to protect their health, families, and communities, such as choosing safer locations to live, be outside, engage in outdoor recreation, or send their children to school, and advocating for protection from hazardous air pollutants in order to advance their recreational, aesthetic, health, safety, and other interests.  It also hinders the ability of Plaintiffs to receive greater

protection from local air quality regulatory agencies, in the form of stricter emission standards or more stringent permits for specific facilities.

85.     Plaintiffs and their members also suffer harm because the Administrator has not promulgated any effective final rule or determination regarding the status of the existing standards, technological updates affecting those standards, the health and environmental risks that remain after application of those standards, or the need for residual risk standards for petroleum refineries.  Any such final rule or determination would be judicially reviewable.  *See* 42 U.S.C. § 7607(b) (providing for judicial review of "any emission standard or requirement under Section 7412"); *see also id.* § 7607(d) (describing procedural rights granted to interested parties in Section 112 rulemakings).  The Administrator's failures deprive Plaintiffs and their members of the opportunity to receive judicial review of the lawfulness of final EPA actions regarding technology-based and residual risk standards.  *See id.* § 7607(b).  Deprivation of the right of judicial review further harms the ability of Plaintiffs and their members to protect their interests.

86.     For all of the foregoing reasons, in connection with the allegations in all paragraphs of this complaint, above and below, the failures complained of herein cause Plaintiffs and their members injuries for which they have no adequate remedy at law. Granting the requested relief would redress these injuries.

## CLAIMS FOR RELIEF

87.     The allegations of all foregoing paragraphs are hereby incorporated as if set forth fully herein.

### Violations of Section 112(f)(2) of the Clean Air Act:

88.     The Administrator's ongoing failures to complete a review of the risk to public health and the environment and promulgate residual risk standards or a final determination not to revise the emission standards for Petroleum Refineries, Subparts CC and UUU, pursuant to Section 112(f)(2), 42 U.S.C. § 7412(f)(2), each constitute the "failure of the Administrator to perform any act or duty under this chapter which is not discretionary" within the meaning of Section 304(a)(2) of the Clean Air Act, 42 U.S.C. § 7604(a)(2), for each source category of petroleum refineries, Subparts CC and UUU.

### Violations of Section 112(d)(6) of the Clean Air Act:

89.     The Administrator's ongoing failures to complete a review and to promulgate either revised standards or a final determination not to revise the emission standards for Petroleum Refineries, Subparts CC and UUU, in accordance with Section 112(d)(6), 42 U.S.C. § 7412(d)(6), each constitute the "failure of the Administrator to perform any act or duty under this chapter which is not discretionary" within the meaning of Section 304(a)(2) of the Clean Air Act, 42 U.S.C. § 7604(a)(2), for each source category of petroleum refineries, Subparts CC and UUU.

### PRAYER FOR RELIEF

90.     WHEREFORE, Plaintiffs respectfully request that the Court:

(1)     Declare that each of the defendant Administrator's failures to complete a review of the risk to public health and the environment and to promulgate either Section 112(f) standards or a final determination that such standards are not required for Petroleum Refineries

26

Subparts CC and UUU within 8 years after promulgation of the initial Section 112(d) standards constitutes a separate count of the "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of Section 304(a)(2), 42 U.S.C. § 7604(a)(2);

(2)     Order the defendant Administrator to complete the required health and environmental review and promulgate either Section 112(f) standards or a final determination that such standards are not required for Petroleum Refineries Subparts CC and UUU, pursuant to Section 112(f)(2), 42 U.S.C. § 7412(f)(2), in accordance with expeditious deadlines specified by this Court;

(3)     Declare that each of the defendant Administrator's failures to complete a review and to promulgate either revised standards under Section 112(d) or a final determination that such revision is not necessary for Petroleum Refineries Subparts CC and UUU, pursuant to Section 112(d)(6), 42 U.S.C. § 7412(d)(6), no less often than every 8 years constitutes a separate count of the "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of Section 304(a)(2), 42 U.S.C. § 7604(a)(2);

(4)     Order the defendant Administrator to complete the required Section 112(d) review and either to promulgate revised standards for Petroleum Refineries Subparts CC and UUU, or a final determination that such revision is not necessary for each such source category, pursuant to Section 112(d)(6), 42 U.S.C. § 7412(d)(6), in accordance with expeditious deadlines specified by this Court;

(5)     Retain jurisdiction to ensure compliance with this Court's decree;

(6)     Award Plaintiffs the costs of this action, including attorney's fees; and,

27

(7)      Grant such other relief as the Court deems just and proper.


DATED: September 27, 2012

Respectfully Submitted,

*/s/ Emma C. Cheuse_____*
Emma C. Cheuse (D.C. Bar No. 488201)

*/s/ James S. Pew (by permission ECC)*
James S. Pew (D.C. Bar No. 448830)
EARTHJUSTICE
1625 Massachusetts Ave., NW, Suite 702
Washington, D.C., 20036
Tel: (202) 667-4500 ext. 5220 or ext. 5214
echeuse@earthjustice.org
jpew@earthjustice.org

*Counsel for California Communities Against Toxics, Coalition for a Safe Environment, and Del Amo Action Committee*


*/s/ Jennifer Peterson  (by permission ECC)*
Jennifer Peterson (D.C. Bar. No. 978352)
Sparsh Khandeshi
ENVIRONMENTAL INTEGRITY PROJECT
1 Thomas Circle, Suite 900
Washington, D.C. 20005
Tel: (202) 263-4446
jpeterson@environmentalintegrity.org
skhandeshi@environmentalintegrity.org

*Counsel for Air Alliance Houston, Community In-Development Association, Environmental Integrity Project, Louisiana Bucket Brigade, and Texas Environmental Justice Services*